UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------X
SHELTER INC. REALTY, JACK SAFOS
and MATTHEW SAFOS,

      Plaintiffs,

  -against-

THE CITY OF NEW YORK, THE CITY OF
NEW YORK DEPARTMENT OF BUILDINGS,
COMMUNITY BOARD 14, JONATHAN
GLASKA, District Manger of
COMMUNITY BOARD 14, individually
and in his official capacity,
JAMES LEONARD, former Borough
Commissioner of THE CITY OF NEW
YORK DEPARTMENT OF BUILDINGS for
the Borough of Queens,
individually and in his official
capacity,

      Defendants.

-------------------------------X

MEMORANDUM AND ORDER

Civil Action No.
CV-01-7015 (DGT)

Trager, J:

    Shelter Inc. Realty, Jack Safos and Matthew Safos

(collectively, "plaintiffs") bring this action pursuant to 42

U.S.C. §§ 1981, 1983[1] and 1985 against The City of New York ("the

City"), The City of New York Department of Buildings ("DOB"),

Community Board 14, Jonathan Gaska, District Manager of Community

---

[1] Although plaintiffs' original complaint alleged a
violation of 42 U.S.C. § 1982, they stated that this action was
brought to "redress violation of plaintiffs' constitutional
rights by reason of deprivation by defendants, acting under color
of law." Compl. ¶ 1. Therefore, it is assumed herein that
plaintiffs intended to bring this action pursuant to 42 U.S.C.
§ 1983.

Board 14, individually and in his official capacity, and James Leonard, former Borough Commissioner of DOB for the Borough of Queens, individually and in his official capacity (collectively, "defendants"). Plaintiffs allege that defendants unfairly targeted them for enforcement of housing code violations because plaintiffs rented their properties to minorities. Plaintiffs charge that defendants' selective enforcement of the housing code violated plaintiffs' Fourteenth Amendment equal protection rights, Fifth Amendment due process rights, First Amendment free speech and free association rights, the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., New York Executive Law § 296 et seq., New York State Human Rights Law § 290 et seq. and the New York City Human Rights Law, N.Y.C. Admin. Code Title 8. Plaintiffs seek (1) compensatory and punitive damages in the amount of five million dollars each, (2) declaratory judgment regarding the legal occupancy of one of their properties and (3) a permanent injunction enjoining defendants from taking enforcement action against that property on the basis of illegal occupancy. Defendants have moved for summary judgment on all claims. For the following reasons, the motion is granted.

**Background**

Plaintiffs Jack Safos and Matthew Safos are officers of plaintiff Shelter Inc. Realty. In or about July 1998, plaintiff

Shelter Inc. Realty purchased a Single Room Occupancy ("SRO") property located at 175 Beach 115th Street in Rockaway, Queens, New York (the "Beach 115th Street SRO"). Plaintiffs Jack and Matthew Safos are also officers of 113 Rock Hotel Corp. or Rock Hotel Corp. In or about 2000, 113 Rock Hotel Corp. purchased an SRO located at 147 Beach 113th Street in Rockaway, Queens, New York (the "Beach 113th Street SRO"). Plaintiffs rented rooms in both SROs on a month-to-month basis, primarily to minorities. After purchasing these properties, plaintiffs allege that they were continuously harassed by the defendants' issuance of numerous building code violations. In addition, the City issued a vacate order for the Beach 115th Street SRO on February 8, 1999. Plaintiffs allege that these actions were taken as a result of defendants' racially-motivated selective enforcement practices.

A strikingly similar case was brought by a different plaintiff in the same community which involved many of the same defendants and raised many of the same issues of law. See Andrews v. City of New York, No. 01-cv-7333 (E.D.N.Y. Nov. 22, 2004) (Sifton, J.). Therefore, much of the explanatory background that follows is drawn from that case, as many of the facts are not only identical but also gleaned from some of the same affidavits and depositions, which were submitted in both cases.

### Department of Buildings

The DOB "is an agency of the City responsible for ensuring compliance with the regulations and codes pertaining to building construction safety, certificates of occupancy, zoning, alteration and renovation of building structures." <u>Andrews</u>, slip op. at 3. To enforce the regulations and codes, building inspectors can issue summonses and commence criminal proceedings for violations. In some cases, the DOB may issue vacate orders "when a property presents a danger to the health and welfare of the inhabitants or others." <u>Id.</u>

Charles Fraser was the Assistant Commissioner for Enforcement at the DOB from November of 1998 to November of 2003. According to Mr. Fraser, inspections are, for the most part, complaint-based. In other words, the DOB generally inspects a property only when it has received a complaint. The DOB is required by law to maintain records of complaints and "cause all complaints to be investigated." NYC Code § 26-104. Records indicate the name and address of the complainant, the name of the person complained of, the date of entry of the complaint and any suggested remedies. The records do not include the racial makeup of tenants in the complained of buildings. All information, excluding the name and address of the complainant, is available to DOB staff and the public. If an inspector finds a code

violation, one or more tickets will be issued.

A field inspector can also issue a vacate order when a building is "dangerous or detrimental to life or health." NYC Code § 26-127(a). According to Mr. Fraser, however, vacate orders are generally not issued by field inspectors, but rather by the borough commissioner after receiving a recommendation to vacate from the inspector. Regardless, a field inspector can post a vacate order on the building if necessary. See NYC Code § 26-127(b). If a vacate order is posted, "officers and employees of the police department, the department, and other authorized officers and employees of the city shall immediately act upon and enforce such order." NYC Code § 26-127(c). An order to vacate can be rescinded if the owner "provides assurance, in a form satisfactory to the commissioner, that the conditions which caused the issuance of such order have been corrected and will not reoccur." NYC Code § 26-127(f).

James Leonard was the Borough Commissioner for the DOB in Queens from August 3, 1998 until September 29, 2001. In 2001, Mr. Leonard was indicted for professional misconduct and offering a false instrument related to a property in Middle Village, Queens. Mr. Leonard allegedly destroyed a DOB file for a home in Queens and obtained a "blind" inspector for the same property. The indictment was subsequently disposed of pursuant to a plea agreement.

## Community Board 14

Community Board 14 was formed pursuant to the City Charter and serves as an intermediary between the community and city agencies to assist in dealing with quality of life issues in Rockaway Park, among other neighborhoods.  Community Board 14 responds to complaints received from members of the community. The Community Board contacts the DOB about complaints via telephone, letter and the internet.  The Community Board has a limited and advisory role.  Around March of 2003, the racial makeup of Community Board 14 was about 55% white and 45% black and Latino.

Jonathan Gaska (previously named improperly as "Glaska") is and was at all times relevant to this complaint the District Manager of Community Board 14 in Queens.  The District Manager of Community Board 14 is not a policy-maker for the Community Board. Mr. Gaska acts on behalf of the Board and follows their policy. According to Mr. Gaska, the community was particularly concerned with repeat offenders of housing codes.  Mr. Gaska does not believe that any complaints received by the Community Board, including those regarding plaintiffs' properties, were racially motivated.  Plaintiffs disagree.

### Special Enforcement

At some point during the time relevant to this complaint, an Illegal Conversion Task Force ("Task Force") was created by the office of the Queens Borough President to address illegal conversions of residential properties that were causing health and safety issues. Illegal conversions involving SROs pose special fire safety dangers, because they tend to be high-density buildings, the tenants often use potentially unsafe cooking devices due to a lack of kitchen facilities and the structures are often old and wood-framed.

Plaintiff Matthew Safos was included on a list of "major offenders" created by the DOB. According to Assistant Commissioner Fraser, this list consisted of property owners who owned multiple properties in diverse areas with numerous uncorrected buildings violations, including illegal conversions. According to Mr. Safos, plaintiffs restored, repaired and maintained their buildings to avoid violations. When the list of major offenders was originally created, there were seventy-two non-compliant properties on the list. By February 2001, only fifteen remained non-compliant, and none of these fifteen properties were owned by Matthew Safos.

According to DOB Assistant Commissioner Fraser, there was no interest or inquiry into the race or ethnicity of the tenants of

major offenders.  In addition, Mr. Fraser asserts that race played no role in any of the enforcement activities undertaken by the City or any of its agencies in connection with the plaintiffs' properties.  Plaintiffs disagree.  Plaintiffs, however, acknowledge that no statements were ever made by Borough Commissioner Leonard or Community Board District Manager Gaska suggesting that race played a role in the City's actions. Plaintiffs also admit that no threats were ever made by any City employee about renting to minority tenants.  Nonetheless, plaintiffs contend that statements made to them by community board members, accompanied by the City's actions, were demonstrative of Mr. Leonard and Mr. Gaska's intentions and motivations.

### (4)

### The Vacate Order

On Saturday, February 6, 1999, Inspector Thomas Connors inspected the Beach 115th Street SRO, which was one of the locations listed on his daily "route sheet."  According to the hand-written records in Mr. Connors's possession, the building had a legal occupancy of twenty-eight class B rooms.  Class "B" rooms are designed primarily for transient occupancy.  <u>See</u> N.Y. Mult. Dwell. Law § 4(9) (McKinney 2001).  Mr. Connors observed a total of thirty class B rooms in the building.  Due to the additional rooms observed, Mr. Connors issued a notice of

violation for illegal occupancy.  Plaintiffs assert that the two extra rooms were storage rooms and not bedrooms.

Mr. Connors also observed a wraparound porch in disrepair and issued a second violation for failure to maintain the porch. Although plaintiffs do not agree with Mr. Connors's characterization of the porch's physical condition, they acknowledge that a notice of violation was issued.  Plaintiffs state further that they made the appropriate repairs in compliance with the notice.

On Monday, February 8, 1999, Inspector Connors provided Borough Commissioner Leonard with a copy of the two notices of violation.  Mr. Leonard reviewed the records upon which Mr. Connors had based his inspection.  Mr. Leonard observed that at least one of the hand-written records appeared to have been altered.  Although the document stated that the 115th Beach Street SRO had a legal occupancy of twenty-eight rooms, it looked as though someone had, at some point, written a different number over the original number on the record.  Plaintiffs agree that the records were altered but further assert that Mr. Leonard himself altered them.

In any event, Mr. Leonard asked the Department of Housing Preservation and Development of the City of New York ("HPD") to search their records and determine the correct legal occupancy of

the Beach 115th Street SRO.[2]  HPD computer records reflected that the legal use and occupancy was fourteen class B rooms and one class A apartment to be occupied in the summer only.  Plaintiffs acknowledge this computer record but give it no weight and suggest that Mr. Leonard altered the computer records as well. Plaintiffs produce no evidence in support of this contention other than pure conjecture.

Based on the HPD computer record, Mr. Leonard determined that there were more than twice as many class B rooms as legal occupancy allowed.  Mr. Leonard found that this overcrowding in a wood structure such as the Beach 115th Street SRO would not permit a safe and prompt evacuation of the tenants in the event of a fire.  Therefore, Mr. Leonard stated that the Beach 115th Street SRO presented imminent danger to the occupants. Plaintiffs suggest that since Mr. Leonard had not personally observed the property, he was not properly situated to make such an assessment.  The actual occupancy and the materials used in the structure of the 115th Beach Street SRO, however, are not in dispute.  Thus, if the HPD Computer Record was correct, Mr. Leonard had sufficient information to make this assessment. Absent evidence to the contrary, plaintiffs' counter-arguments

---

[2] Before the City required a certificate of occupancy, records were maintained manually on Identification Cards, or "I Cards," until computer records were kept beginning in the 1960s. At that time, all information contained on the I Cards was entered onto HPD's computer system.

must fail.

On February 8, 1999, two days after Mr. Connors's inspection, a vacate order was issued for the Beach 115th Street SRO. On February 9, 1999, the vacate order was executed.[3] All persons living at the Beach 115th Street SRO were asked to leave the building. According to the plaintiffs, the tenants were given forty-five minutes to gather their belongings and leave. Such a short time period to vacate seems facially unreasonable under the circumstances; however, since all residents of the Beach 115th Street SRO were month-to-month tenants, plaintiffs lost no rental income as a result of the vacate order. Instead, plaintiffs contend that they suffered damages for "continual stopping of work and messing up the stucco and continually impeding progress of work." Jack Safos Dep. 165. Plaintiffs do not clarify, however, how the vacate order caused this damage nor do they elaborate as to how it amounts to five millions dollars in compensatory damages.

**(5)**

### The Article 78 Proceeding

Plaintiffs commenced a state court Article 78 proceeding

---

[3] There is some dispute in the record as to whether the vacate order was executed on February 8th or 9th. Plaintiffs offer both dates in different places of the record. Whether the order was executed on the 8th or the 9th, however, has no bearing on any of the legal issues in this case. Therefore, the remainder of this opinion will assume the order was executed on the 9th, as that is what the majority of the evidence suggests.

seeking to compel the City to vacate and/or rescind the vacate order for the Beach 115th Street SRO. As a part of that action, plaintiffs alleged that "the Peremptory Vacate Order is a sham and the product of a discriminatory practice" by the defendants. Art. 78 Compl. ¶ 25. By a memorandum decision, Justice Arnold N. Price of the Supreme Court of the State of New York denied the relief requested, dismissed the petition, and directed that a judgment to that effect be "settled." Matter of Shelter, Inc., No. 5503-99 (Sup. Ct. Queens County June 14, 1999). Justice Price found that "there is ample evidence to support the Commissioner's findings of conditions perilous to life and property [and] such findings were neither arbitrary nor capricious, nor an abuse of discretion." Id. at 6. No appeal was taken from the order of Justice Price dismissing the petition. Plaintiffs subsequently filed this action in the Eastern District of New York.

## Discussion

### (1)

### Claim and Issue Preclusion

As a preliminary matter, defendants argue that plaintiffs' claims for declaratory and injunctive relief are barred by the judgment rendered in the Article 78 proceeding under the doctrine of claim preclusion. In addition, defendants assert that

plaintiffs' allegations of selective enforcement and "discriminatory practice" were raised in the Article 78 proceeding and are, therefore, barred by issue preclusion.

Article 78 judgments carry the same preclusive effect in federal court as would be given by the state courts of New York. Warren v. Migra City Sch. Dist., 465 U.S. 75, 81 (1984); Conopco v. Roll Int'l, 231 F.3d 82, 87 (2d Cir. 2000). Thus, it must be determined whether the outcome of the Article 78 proceeding has a preclusive effect in this case.

**a. Claim Preclusion**

Under the doctrine of claim preclusion, "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398 (1981). Federal courts must give the same preclusive effect to a state court judgment as would be given in the courts of that state. Migra v. Warren City School Dist., 465 U.S. 75, 85 (1984).

Under New York law, a prior judgment will preclude all other claims which involve the same parties and the same transaction or connected series of transactions as the earlier suit. Parker v. Blauvelt Volunteer Fire Co., 93 N.Y.2d 343, 347, 712 N.E.2d 647, 649-50, 690 N.Y.S.2d 478, 481 (1999). Claim preclusion, however, does not bar a subsequent claim for relief if the court that

rendered the prior judgment did not have the power to award the
relief sought in the subsequent action.  Id., 93 N.Y.2d at 348,
712 N.E.2d at 650, 690 N.Y.S.2d at 482.  An Article 78 proceeding
limits damages to those which are "incidental to the primary
relief sought."  N.Y. C.P.L.R. § 7806 (McKinney 1994).  The New
York Court of Appeals has, therefore, held that a judgment in a
prior Article 78 proceeding does not have claim preclusive effect
on subsequent § 1983 claims for monetary damages due to the
limitations set forth in CPLR § 7806.  Id.; see also Davidson v.
Capuano, 792 F.2d 275 (2d Cir. 1986); accord Giana v. Flood, 803
F.2d 769, 771-72 (2d Cir. 1986).  Accordingly, claim preclusion
does not apply to plaintiffs' claims for compensatory and
punitive damages.

An Article 78 proceeding may, however, have a preclusive
effect on claims for injunctive or declaratory relief if those
claims have been fully and fairly litigated in the Article 78
proceeding.  Fay v. South Colonie Cent. School Dist., 802 F.2d
21, 30 (2d Cir. 1986) (finding that because plaintiff "could have
litigated his claims for injunctive relief in the Article 78
proceeding . . . [he is] barred from doing so now"), overruled on
other grounds by Taylor v. Vermont Dep't of Educ., 313 F.3d 768
(2d Cir. 2002).  Here, plaintiffs request declaratory judgment as
to the number of rooms that can be legally rented at the Beach
115th Street property.  See Compl. ¶ 55.  Plaintiffs also ask

14

this court to enjoin defendants from issuing "any summonses, violations or notices of violation, with respect to the number of units which can be rented at the Beach 115th Street property." See Compl. ¶ 56.

In the Article 78 proceeding, plaintiffs requested the exact same relief. The state court judge had the power to grant plaintiffs declaratory and injunctive relief but refused. In doing so, Justice Price of the Queens County Supreme Court stated that "the Commissioner was entitled to rely on the HPD computer records, especially as the handwritten records contained written changes devoid of any explanation for these changes." Matter of Shelter, Inc., No. 5503-99, at 5-6 (Sup. Ct. Queens County June 14, 1999). Because the HPD computer records clearly and unambiguously stated that the Beach 115th Street property can only rent fourteen class B rooms and one class A room for summer occupancy, the Article 78 proceeding determined that the DOB properly issued the vacate order for the Beach 115th Street SRO. Thus, plaintiffs' claims for declaratory and injunctive relief are barred in the present matter by claim preclusion.

**b. Issue Preclusion**

Under the doctrine of issue preclusion, a party is barred from raising an issue of law or fact that has previously been litigated and determined in a prior proceeding by a valid and final judgment. Parker, 93 N.Y.2d at 349, 712 N.E.2d at 651, 690

15

N.Y.S.2d at 482. In a federal action, a state court judgment is entitled to the same preclusive effect as it would have in that state's court. Migra, 465 U.S. at 83.

Under New York law, "[t]he doctrine applies if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." Parker, 93 N.Y.2d at 349, 712 N.E.2d at 651, 690 N.Y.S.2d at 482; see also Ryan v. New York Tel. Co., 62 N.Y.2d 494, 500, 467 N.E.2d 487, 490, 478 N.Y.S.2d 823, 826 (1984); Latino Officers Ass'n v. City of New York, 253 F. Supp. 2d 771, 783 (S.D.N.Y. 2003). The party seeking to preclude an issue bears the burden of showing that the issues are identical and were decided in the prior action, while the opposing party must show that the prior action did not afford him or her a full and fair opportunity to litigate the issues. Parker, 93 N.Y.2d at 349, 712 N.E.2d at 651, 690 N.Y.S.2d at 482.

In the instant case, defendants argue that issue preclusion bars plaintiffs from raising the issues of selective enforcement and "discriminatory practice," because those claims were raised in the Article 78 proceeding. Defendants allege that plaintiffs' Equal Protection, Due Process and First Amendment claims are intertwined with these issues. Indeed, plaintiffs alleged in their Article 78 complaint that "the Peremptory Vacate Order is a

16

sham and the product of a discriminatory practice on the part of the [defendants]." Art. 78 Compl. ¶ 25. Plaintiffs' complaint in the present matter raises the same issues throughout their complaint. <u>See</u> Compl. ¶ 31 (alleging that defendants did not "enforc[e] Building's codes and regulations against similarly situated SRO's that do not rent to minorities"); Compl. ¶ 36 (alleging that defendants acted "in furtherance of a discriminatory scheme"); ¶ 38 (basing a First Amendment claim on "defendants' discriminatorily motivated efforts").

Justice Price saw no merit in plaintiffs' selective enforcment claim during the Article 78 proceeding, finding that "there is ample evidence to support the Commissioner's findings of conditions perilous to life and property [and] such findings were neither arbitrary nor capricious, nor an abuse of discretion." <u>Matter of Shelter, Inc.</u>, No. 5503-99, at 6. In responding to plaintiffs' Article 78 complaint, the state court judge effectively rejected plaintiffs' claim of selective enforcement and discriminatory practice. <u>See</u> <u>Parker</u>, 93 N.Y.2d at 350, 712 N.E.2d at 651, 690 N.Y.S.2d at 483 (finding that the dispositive factual and legal issues in plaintiff's § 1983 action were identical to, and, therefore, barred by, the allegations asserted and decided against him in a prior Article 78 proceeding); <u>Latino Officers Ass'n</u>, 253 F. Supp. 2d at 787 (finding that an issue raised by a discharged police officer in

an Article 78 proceeding was implicitly rejected by a state court
judgment which found substantial evidence to support the
officer's dismissal).

Finally, if the issue is to be precluded, it must also have
been necessary to the outcome of the Article 78 proceeding.
Parker, 93 N.Y.2d at 349, 712 N.E.2d at 651, 690 N.Y.S.2d at 482;
see also Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147,
153 (2d Cir. 2006); Vargas v. City of New York, 377 F.3d 200, 206
(2d Cir. 2004).  In this case, Justice Price explicitly rejected
the vacate order as arbitrary or capricious, signaling to the
plaintiffs that he had considered all aspects of their claim.  In
addition, had the state court judge determined that the closing
of plaintiffs' property was the result of selective enforcement
or discriminatory practice, the Article 78 proceeding could not
have been decided in favor of the City.  Thus, plaintiffs are
barred from relitigating the issue of whether the Peremptory
Vacate Order was issued as a result of a discriminatory practice
on the part of the defendants as it relates to any of plaintiffs'
current claims.

Nonetheless, plaintiffs urge this court to reconsider these
issues, as they allege that new facts have arisen since the
outcome of the Article 78 proceeding, which they suggest was
narrow in its scope of determination.  Plaintiffs, however, have
failed to produce any evidence of these alleged new facts to

support this contention.  Although they do allege that additional meritless or selectively issued violations have been issued on their properties following the vacate order, they have not only failed to produce these violations, but have also failed to show why they were meritless or selectively issued upon their properties.  Plaintiffs' mere conclusory allegations of additional wrongdoing are not enough to overcome the finality of the state court's prior judgment.

## (2)

### Equal Protection

Plaintiffs allege in their first claim for relief, pursuant to §§ 1983 and 1985, that the defendants violated their right to equal protection under the Fourteenth Amendment of the United States Constitution.  Compl. ¶¶ 31-33.  As noted above, collateral estoppel precludes plaintiffs from relitigating issues that were fully and fairly decided in the Article 78 proceeding, namely the issues of selective enforcement and discriminatory practice.  In any event, plaintiffs have failed to demonstrate that a genuine issue of material fact exists as to their equal protection claims.

Under § 1983, municipalities and other local government bodies cannot be held liable "solely because of the discriminatory actions of one of its employees."  Back v.

<u>Hastings on Hudson Union Free Sch. Dist.</u>, 365 F.3d 107, 128 (2d
Cir. 2004) (citing <u>Monell v. Dep't of Social Servs.</u>, 436 U.S.
658, 690-91 (1978)).  Defendants can only be held liable if
plaintiffs prove that defendants' "policy or custom . . .
inflicts the injury."  <u>Monell</u>, 436 U.S. at 694; <u>see also</u> <u>Owens v.
Haas</u>, 601 F.2d 1242, 1247 (2d Cir. 1979) (applying the
requirements for municipality liability under § 1983 to § 1985
claims).  A plaintiff must prove that a city official is acting
pursuant to a formal policy "officially promulgated and adopted"
by the municipality, <u>Monell</u>, 436 U.S. at 690, or that the
official is carrying out a "widespread practice that, although
not authorized by written law or express municipal policy, is so
permanent and well settled as to constitute a custom or usage
with the force of law."  <u>St. Louis v. Praprotnik</u>, 485 U.S. 112,
126 (1988) (internal quotations and citation omitted).

The equal protection clause is "essentially a direction that
all persons similarly situated be treated alike."  <u>City of
Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439 (1985).
Neither § 1983 nor § 1985 grant plaintiffs any substantive
rights, but rather both provide a vehicle through which
plaintiffs can recover for alleged constitutional violations.
<u>See</u> <u>Andrews</u>, slip op. at 23-24 (citing <u>City of Oklahoma City v.
Tuttle</u>, 471 U.S. 808, 816 (1985) and <u>Great Am. Fed. Sav. & Loan
Assoc. v. Novotny</u>, 422 U.S. 366, 372 (1979)).  To prevail on a

selective enforcement equal protection claim pursuant to § 1983, plaintiffs must show that "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995) (citations omitted).

In their attempt to prove that they were treated differently from others similarly situated, plaintiffs have offered no evidence that other similarly situated buildings had violations of their own and no evidence that suggests the defendants knew of other violations and failed to inspect these buildings. As an aside, defendants have pointed out that the DOB is primarily complaint-driven. Therefore, even if similarly situated buildings had violations, defendants would in all likelihood not inspect those buildings unless the violations were brought to their attention. The only evidence plaintiffs have brought to support their equal protection claim is their own conclusory allegations. "Mere conclusory allegations, speculation or conjecture will not avail a party seeking summary judgment." Beechwood, 436 F.3d at 155 (quoting Cifarelli v. Village of Babylon, 93 F.3d 47, 51 (2d Cir. 1996) (internal quotation marks

omitted)).

To show that defendants' supposed selective enforcement was racially motivated, plaintiffs allege that defendants issued "numerous summonses and violations . . . as a means of implementing a discriminatory and illegal policy of excluding minorities from Rockaway Park." Compl. ¶ 33. Plaintiffs fail to produce so much as one of these "numerous" summonses or to offer any support for their allegations that these additional violations were meritless or arbitrarily issued. Instead, plaintiffs again offer mere speculation and conclusory allegations in support of their claim, hardly surpassing the allegations made out in their initial complaint. The Federal Rules expressly state that "[w]hen a motion for summary judgment is made[,] an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading." Fed. R. Civ. P. 56(e).

Plaintiffs also attempt to offer the hearsay statements of community board members and neighboring landlords, amongst others. Plaintiffs allege that defendants made statements to these individuals which evidenced their nefarious motives, and these individuals, in turn, relayed the statements to plaintiffs. Plaintiffs do not offer any affidavits from the individuals to whom defendants allegedly made the statements. These statements constitute hearsay and are, therefore, inadmissible.

The Federal Rules require that a party opposing a motion for summary judgment "shall set forth facts as would be admissible in evidence." Fed. R. Civ. P. 56(e). As a general rule, hearsay statements are not admissible evidence unless they fall under a designated exception to the rule. Fed. R. Evid. 802. Plaintiffs allege that these statements may constitute party admissions or declarations against interest. Even if that were the case, plaintiffs have failed to depose any of these third parties or produce affidavits attesting to defendants' supposed statements to them. Thus, plaintiffs have failed to clear the hurdle that is the second level of hearsay.

At best, plaintiffs may have evidence sufficient to show racial animus in the community. Fatally lacking from their equal protection claim, however, is any evidence from which a reasonable person could conclude that the defendants and <u>not the community</u> were motivated by discrimination and acted pursuant to some widespread policy or custom. Thus, summary judgment is granted to the defendants as to the equal protection claim.

**(3)**

**Due Process**

As a second claim for relief, plaintiffs allege that defendants deprived them of their due process rights under the Fifth Amendment of the United States Constitution "to be free of

the deprivation of property without due process of law, by
causing plaintiffs to lose substantial rental income from the
subject properties without notice and an opportunity to be
heard."  Compl. ¶ 30.  As a preliminary matter, the Fifth
Amendment is only applicable to violations of due process
committed by federal officials.  <u>See</u> <u>Dusenbery v. United States</u>,
534 U.S. 161, 167 (2002) ("The Due Process Clause of the Fifth
Amendment prohibits the United States, as the Due Process Clause
of the Fourteenth Amendment prohibits the States, from depriving
any person of property without 'due process of law.'").

    Assuming that plaintiffs intended to bring this claim under
the Fourteenth Amendment, summary judgment for defendants is,
nonetheless, still appropriate.  To establish a deprivation of
property without due process, the plaintiff must "first identify
a property right, second show that the state has deprived him of
that right, and third show that the deprivation was effected
without due process."  <u>Mehta v. Surles</u>, 905 F.2d 595, 598 (2d
Cir. 1990).  Assuming that rental income is a property right,[4]
plaintiffs must still demonstrate that the purported deprivation
occurred without due process.  With respect to a vacate order,
only a post-deprivation remedy is constitutionally required when

_____

    [4] <u>See</u> <u>O'Grady v. City of Montpelier</u>, 573 F.2d 747, 751 (2d
Cir. 1978) (declining to determine, on an insufficient record,
whether loss of rental income amounted to a constitutional cause
of action).

24

emergency action is necessary.  <u>Catanzaro v. Weiden</u>, 188 F.3d 56, 61 (2d Cir. 1999) (citing <u>Paratt v. Taylor</u>, 451 U.S. 527, 539 (1981)).

Here, defendants concluded that occupancy of the Beach 115th Street SRO at more than double its legal rate combined with the fact that the SRO was wood-framed and a potential fire hazard constituted an emergency.  Defendants acted within their discretion in making this decision.  <u>See</u> NYC Code § 26-127(a), (b).[5]  As such, plaintiffs were only entitled to a post-deprivation remedy.  Plaintiffs not only availed themselves of such a remedy - the Article 78 proceeding - but the state court found that the defendants' actions "were neither arbitrary nor capricious, nor an abuse of discretion."  <u>Matter of Shelter, Inc.</u>, No. 5503-99 at 6.  In addition, Community Board 14 acts only as an advisory body, and as such, cannot deprive plaintiff of any property right.  <u>See</u> N.Y.C. Charter § 2800; <u>Cmty. Bd. 7 v. Schaffer</u>, 84 N.Y.2d 148, 159 (1994) (describing a community board's role as "purely advisory in nature").  Accordingly, plaintiffs' procedural due process claim, even if properly pleaded, fails to state a claim for which relief can be granted and is, therefore, dismissed.

---

[5] NYC Code § 26-127(a) provides the commissioner with the authority to close down a building which is deemed "dangerous of detrimental to life or health."  NYC Code § 26-127(a). Subsection b provides the commissioner with the authority to do so immediately upon a showing of an emergency.  <u>Id.</u> § 26-127(b).

Giving plaintiffs the benefit of the doubt and assuming that they intended to bring a substantive due process claim, that claim is likewise dismissed. To make out a case for a substantive due process violation, plaintiffs must show that defendants' conduct was "so outrageously arbitrary as to constitute a gross abuse of governmental authority." <u>Natale v. Town of Ridgefield</u>, 170 F.3d 258, 263 (2d Cir. 1999). Not only have plaintiffs failed to provide any facts to suggest that the DOB acted in furtherance of a discriminatory scheme, but plaintiffs have also failed to provide any admissible evidence which would support their conclusory allegations that the vacate order or other violations were groundless. In light of this, it is difficult to imagine any construction of the facts under which this would constitute the level of conduct required to establish a substantive due process claim. Thus, summary judgment is granted to the defendant as to the second claim for relief.

**(4)**

**First Amendment**

As a third claim for relief, plaintiffs allege that defendants "conspired to violate plaintiffs' rights to free speech and free association . . . by retaliating against plaintiffs for speaking out on defendants' discriminatorily motivated efforts to prevent SRO owners from renting to

minorities." Compl. ¶ 38. Without specifically identifying any protected speech, plaintiffs allege that they "publicly complained about their treatment; it grew more punitive." Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. at 30. In their complaint, plaintiffs allege that they notified the press and others of "Glaska's and Leonard's campaign to harass SRO owners who rented to minorities and close down their SRO's," and that they "met with and communicated to the press, the Queens Borough President" and others "their concerns about defendants' discriminatory and illegal targeting of SRO's which rented to minorities." Compl. ¶¶ 25-26. Plaintiffs also claim that defendants "retaliated against them by peremptorily and without a sufficient basis for, closing a residential property they owned, without notice or an opportunity to be heard," Compl. ¶ 39, and by "issuing numerous baseless summonses and violations with the calculated intent to make it impossible for plaintiffs to continue to operate SRO's in Rockaway Park." Compl. ¶ 40.

To succeed on their First Amendment claim, plaintiffs must show that they "engaged in protected speech, and that the speech was a substantial or motivating factor in an adverse decision taken by the defendant." <u>Beechwood</u>, 436 F.3d at 152. Plaintiffs, however, have failed to raise any genuine issue of material fact to make out such a claim. Even assuming that plaintiffs engaged in protected speech, defendants have stated

that "issuance of the vacate order and enforcement of the
Building Code were based on facts unrelated to plaintiffs'
exercise of their First Amendment rights."  Defs.' Mem. in Supp.
of Mot. for Summ. J. at 23.  The facts of record support
defendants' assertion.  Not only did the inspection of the Beach
115th Street SRO demonstrate the pressing need to issue a vacate
order, but the Article 78 proceeding confirmed the validity of
defendants' decision to do so.  Furthermore, plaintiffs have
produced no admissible evidence to rebut this presumption other
than the same speculative and conclusory allegations on which
they have based their entire case.  Cf., Beechwood, 436 F.3d at
153-54 (holding that plaintiffs produced sufficient evidence of
retaliatory motive to survive summary judgment where they
produced celebratory e-mails sent by defendants following news
that plaintiffs' provider agreement was being revoked).
Accordingly, summary judgment is granted to defendants on the
third claim for relief.


### (5)

### Fair Housing Act

As a fourth claim for relief, plaintiffs allege that
"[d]efendants' calculated policy of using Buildings as an
instrument to discriminate against minorities by targeting SRO's
that rent to minorities" violates the Fair Housing Act ("FHA"),

42 U.S.C §§ 3601 et seq., "which prohibits discrimination in the housing market based on race, color, religion, or national origin, and bars all racial discrimination, private as well as public, in the sale and rental of real property." Compl. ¶ 44. Defendants allege that this claim is time-barred. Defs.' Mem. in Supp. of Mot. for Summ. J., at 26. Defendants point out that the only vacate order in this lawsuit was issued on February 9, 1999. Id. The complaint in this matter was filed on October 23, 2001. The statute of limitations for suits brought under the FHA is two years. 42 U.S.C. § 3613(a)(1)(A). Under defendants' construction of the facts, the FHA violation is time-barred.

Plaintiffs counter, however, by claiming that the FHA violation is a "continuing violation" and is, therefore, timely. Mem. of Law in Opp'n to Defs.' Mot. for Summ. J., at 34. The "continuing violation" doctrine applies when a plaintiff challenges "not just one incident of conduct violative of the Act, but an unlawful practice that continues into the limitations period." Havens Realty Corp. v. Coleman, 455 U.S. 363, 380-81 (1982); see also Cornwell v. Robinson, 23 F.3d 694, 703 (2d Cir. 1994). To constitute a timely complaint, a plaintiff must file "within 180 days of the last asserted occurrence of that practice." Havens, 455 U.S. at 381. In the Second Circuit, "[a] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices."

29

Cornwell, 23 F.3d at 703.

Here, the only _specific_ date of injury provided by the plaintiffs is that of the vacate order: February 9, 1999. Plaintiffs seek to avail themselves of the "continuing violation" doctrine due to the defendants' purported issuance of groundless violations following the vacate order. Again, plaintiffs have only made vague and unsubstantiated blanket accusations regarding these assertions. Plaintiffs have failed to produce any evidence that suggests these violations were meritless nor have they produced so much as one of these alleged violations. This is hardly sufficient to allege a "continuing violation" of the FHA. _See_ _Lambert v. Genesee Hosp._, 10 F.3d 46, 53 (2d Cir. 1994) (noting that "multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation"); _cf._ Cornwell, 23 F.3d at 704 (finding a continuing violation where the plaintiff showed a pattern of essentially daily discrimination and harassment over a period of five years). Accordingly, plaintiffs' fourth claim for relief is dismissed as untimely.


**(6)**

**Tortious Interference / § 1981**

As a sixth claim for relief, plaintiffs allege that

30

defendants' discriminatorily motivated closing of the Beach 115th Street SRO constituted a tortious interference with the contractual relations between plaintiffs and his tenants.  See Compl. ¶¶ 48-51.  To succeed on a claim of tortious interference, a plaintiff must show "the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom."  Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424, 668 N.E.2d 1370, 1375, 646 N.Y.S.2d 76, 82 (1996).  Plaintiffs have failed to provide any evidence sufficient to establish even one of these four elements.

First, plaintiffs rent their properties on a month-to-month basis and cannot establish that they had any contracts with their tenants.  While plaintiffs claim to have created written contracts when a tenant requested it, they have not been able to produce any of these documents.  Second, there is no evidence which would support the notion that the defendants knew of such contracts and intentionally and improperly procured the breach of these contracts.  Finally, plaintiffs have failed to demonstrate that the alleged damage they suffered was the result of tortious interference, rather than stemming from legitimate building code violations.  Plaintiffs point to "continual stopping of work and

messing up the stucco" as damages, Jack Safos Dep. 165, but do not give any indication as to how this damage was caused by the defendants' actions. Thus, summary judgment is granted to the defendants on plaintiffs' sixth claim for relief.

Furthermore, to the extent that plaintiffs bring this claim pursuant to 42 U.S.C. § 1981, it is also dismissed. Section 1981 states that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." 42 U.S.C. § 1981. Section 1983 provides the exclusive damages remedy for violations of § 1981 when the claim is against state actors. Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 735 (1989). To prevail on such a claim, a plaintiff must show that the violation of his "right to make contracts" protected by § 1981 was caused by a custom or policy within the meaning of Monell. Id. at 735-36. A plaintiff must also show an intent to discriminate on the basis of race. Mian v. Donaldson, Lufkin & Jenrette Secs. Corp., 7 F.3d 1085, 1087 (2d Cir. 1993). Plaintiffs have failed to provide any facts which would demonstrate a custom or policy that interfered with their right to make contracts and have likewise failed to provide any evidence supporting allegations of discriminatory intent. Accordingly, to the extent this claim is asserted pursuant to § 1981, summary judgment is granted to the defendants.

### Abuse of Governmental Authority

As a seventh claim for relief, plaintiffs allege that defendants Gaska and Leonard "exceeded and abused their authority . . . by using their official positions for impermissible and unlawful means [which] directly and proximately caused plaintiffs to lose substantial income from the subject properties as well as other monetary damages." Compl. ¶¶ 52-53. Defendants respond that Gaska and Leonard are both entitled to qualified immunity.

Plaintiffs' "abuse of governmental authority" claim comprises two sentences of the complaint. It is not at all clear whether this is an independent federal claim, a rephrasing of the due process claim, or a state law claim. If it is a state law claim, for the reasons discussed in the next section, the court would decline to hear it. If it is a federal claim, it is dismissed for the following reasons.

For plaintiffs to succeed in their claims against Community Board District Manager Gaska and former DOB Borough Commissioner Leonard, they must show that both were personally involved in the alleged violations of plaintiffs' rights. Moffitt v. Town of Brookfield, 950 F.2d 880, 886 (2d Cir. 1991). This can be shown through direct participation, failure to remedy a wrong, creation of a policy under which violations occur, or gross negligence in a supervisory role. Id.

Mr. Gaska, as district manager of Community Board 14, has no power to issue a vacate order or a notice of violation. In addition, the Community Board is not a policy maker. Therefore, any claims against Mr. Gaska are dismissed as there is simply no construction of the facts under which his "personal involvement" can be established. Furthermore, it is difficult to abuse governmental authority when one has none to begin with.

Even if it can be shown that DOB Borough Commissioner Leonard was personally involved in a violation of plaintiffs' rights, he is, nonetheless, entitled to qualified immunity. Government officials are shielded from liability in civil actions "as a result of their performance of discretionary functions." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) (citing Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982)). A government actor defendant is protected by the qualified immunity defense "if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." Id.

Mr. Leonard's discretionary actions in enforcing the DOB's codes and regulations were objectively reasonable. Not only did the documentary evidence establish that plaintiffs' property was in violation of the regulations, but the Article 78 proceeding provided further support for the notion that Mr. Leonard not only acted lawfully, but was objectively reasonable in believing that he did so. Accordingly, plaintiffs' seventh claim for relief is

34

dismissed.

## (8)

### State Law Claims

Plaintiffs' remaining claims arise under state law.  A district court may decline to exercise supplemental jurisdiction over a state law claim if the district court has dismissed all claims over which it has original jurisdiction.  28 U.S.C. § 1367(c).  "[A]s a general proposition, . . . 'if all federal claims are dismissed before trial. . . the state claims should be dismissed as well.'"  Motorola Credit Corp. v. Uzan, 388 F.3d 39, 56 (2d Cir. 2004) (quoting Castellano v. Bd. of Trustees, 937 F.2d 752, 758 (2d Cir. 1991)).  Because plaintiffs' federal claims do not survive summary judgment and no extenuating circumstances are present, the pendent state law claims are dismissed.

## Conclusion

For the aforementioned reasons, the defendants' motion for summary judgment is granted and the action is dismissed in its entirety.  The Clerk of the Court is directed to close the case.


DATED:     Brooklyn, New York
           January 4, 2007


_____/s/_____
David G. Trager
United States District Judge